JOHN S. BROWN ET AL. v. GEORGE C. JACKSON, SHERIFF OF NEW HANOVER COUNTY, ET AL.

(Filed 31 March, 1920.)

1. **Taxation—Corporations—Stockholders.**

Under the provisions of the Machinery Act of 1917, ch. 23, in order for the stockholder to be relieved from paying taxes on his shares of stock in a domestic corporation it must appear that the corporation itself pays a tax on its capital stock, and in foreign corporations, that two-thirds in value of its entire property is situated and taxed in this State, and that the said corporation pays a franchise tax on its entire issued and outstanding capital stock at the same rate paid by domestic corporations.

2. **Same— Foreign Corporations— Domestic Corporations — Railroads — Payment by Corporation.**

Under the provisions of ch. 77, Laws of 1899, being "An act to ratify the consolidation of the Petersburg Railroad Company with the Richmond and Petersburg Railroad Company, under the name of the Atlantic Coast Line Railroad Company of Virginia, and to incorporate the said Atlantic Coast Line Railroad Company in North Carolina," a corporation is created with power to sue and be sued, etc., and it is a domestic corporation.

3. **Constitutional Law—Taxation—Corporations—Foreign Corporations— Domestic Corporations.**

Ch. 23, sec. 4, Laws of 1917, being the Machinery Act, relieving the shareholders in foreign and domestic corporations from paying tax on their shares therein when, in case of domestic corporations, the corporation itself pays this tax on its capital stock, and in case of foreign corporations, when two-thirds of the value of their property is situated in North Carolina, and they pay a certain franchise tax, etc., is within the constitutional powers conferred on the Legislature, and is a valid enactment.

4. **Taxation—Corporations—Shareholders.**

The plaintiff's stock was issued by the Atlantic Coast Line Railroad Company of Virginia, a corporation created by the act of the Legislature

of Virginia, and not by the corporation created by the General Assembly of North Carolina, and it not appearing that two-thirds in value of the property of the Virginia corporation is situated in this State, and it not appearing that said foreign corporation pays a franchise tax on its entire issued and outstanding stock in accordance with the statute, the plaintiff's stock is taxable in the hands of the shareholder, and does not come within the proviso in the statute.

WALKER, J., not sitting; CLARK, C. J., concurring; ALLEN, J., dissenting, but agreeing that the statute is constitutional.

INJUNCTION, returnable before *Stacy, J.,* at Spring Term, 1920, of NEW HANOVER.

An injunction was issued in this case restraining the defendant from collecting taxes assessed and levied upon certain shares of stock issued by the Atlantic Coast Line Railroad Company of Virginia, and belonging to the plaintiff and his associates. The injunction was returnable before *Stacy, J.,* in the county of New Hanover, on 29 July, 1919. His Honor dissolved the injunction, and the plaintiffs appealed to the Supreme Court.

*J. O. Carr and Tillett & Guthrie for plaintiffs.*
*Attorney-General Manning, Assistant Attorney-General Nash, and Marsden Bellamy for city of Wilmington.*
*Robert Ruark for county of New Hanover.*

BROWN, J. This action is brought to enjoin the sheriff of New Hanover county from collecting taxes upon the shares of stock issued by a corporation called the Atlantic Coast Line Railroad Company of Virginia, owned by the plaintiffs, all of whom are residents and citizens of the State of North Carolina. It is contended that the plaintiffs are not required to list or pay the taxes upon said stock under the Machinery Act of 1917, ch. 23, latter part of sec. 4, which reads as follows:

"Individual stockholders in any corporation, joint-stock association, limited partnership or company paying a tax on its capital stock shall not be required to pay any tax on said stock or list the same, nor shall corporations legally holding capital stock in other corporations upon which the tax has been paid by the corporation issuing the same be required to pay any tax on said stock or list the same.

"Nor shall any individual stockholder of any foreign corporation be required to list or pay taxes on any shares of its capital stock if two-thirds in value of its entire property is situated and taxed in the State of North Carolina, and the said corporation pays a franchise tax on its entire issued and outstanding capital stock at the same rate as paid by domestic corporations."

The General Assembly for a long number of years has required domestic corporations to pay the tax upon the corporate stock, and when so done the shareholder is not required to list the stock for taxation. . It is not necessary for us to discuss the reasons which have prompted the General Assembly to subsequently reënact the above quoted statute for so many years.

In order that the stockholder shall get the benefit of the statute, it must appear not only that the corporation is a domestic corporation, but that the corporation itself pays a tax on the capital stock. In the answer of the Tax Commission in this case, it is expressly denied that "the said corporation has paid taxes upon any valuation of its property which included the value of the capital stock of the Atlantic Coast Line Railroad Company, or that the said company pays a tax on its capital stock in this State."

There is no evidence whatever in this record nor any finding of fact to justify the conclusion that the Atlantic Coast Line Company pays . taxes upon its capital stock to the State of North Carolina.

We agree with the learned counsel that the Atlantic Coast Line Railroad Company of Virginia is a corporation of the State of North Carolina, and that it was so decided in *Staton v. R. R.,* 144 N. C., 145, and affirmed in *R. R. v. Spencer,* 166 N. C., 522.

While this is true, there is another corporation known as the Atlantic Coast Line Railroad Company of Virginia, which was incorporated by the Legislature of Virginia, and is a foreign corporation.

The Atlantic Coast Line Railroad Company referred to in the *Staton case* is a domestic corporation, created by the General Assembly of North Carolina on 13 February, 1899, ch. 77, Act 1899, the title of the act being as follows: "An act to ratify the consolidation of the Petersburg Railroad Company with the Richmond and Petersburg Railroad. Company, under the name of the Atlantic Coast Line Railroad Company of Virginia, and to incorporate the said Atlantic Coast Line Railroad Company of Virginia in North Carolina." This is the only statute enacted by any General Assembly of North Carolina relating to this. matter. It creates a North Carolina corporation by the same title as. the Virginia corporation, and enables it to own and operate certain railroads, etc., upon condition that the property of the said Atlantic Coast Line Railroad Company of Virginia, in this State, shall always be liable to taxation under the Constitution and laws of this State, and that the said corporation shall be subject to the tariffs, rules, and regulations prescribed by the board of railroad commissioners.

It is a well known fact that prior to that act, the Wilmington & Weldon Railroad Company, a part of the Atlantic Coast Line system, claimed entire exemption from taxation on its property under the terms.

of its original charter. This Act of 1899 contains no special provisions fixing the amount of the capital stock, the number of shares, or the conditions under which it may be issued. It is perfectly apparent that there was no purpose to issue any stock certificates under the authority of that act, and it is not claimed that any were ever issued by its authority.

It seems to us too plain for argument that there are two corporations called by the name of Atlantic Coast Line Railroad Company of Virginia, one created by the Legislature of North Carolina, a domestic corporation, hereinbefore referred to, and one created by the Legislature of Virginia, which is a foreign corporation.

The North Carolina corporation is simply an ancillary corporation of the Atlantic Coast Line system, which is empowered to own property and may sue and be sued, but has never issued any stock. All of the stock of the Atlantic Coast Line was issued by the parent corporation, chartered by the Legislature of Virginia, which is plainly a foreign corporation. The stock certificates themselves show on their face that they were issued by a corporation "incorporated under the laws of the State of Virginia." Thus it is manifest that the plaintiff's stock was not issued by a domestic corporation and by authority of the State of North Carolina, but by a foreign corporation, and by authority of the State of Virginia.

In order that the plaintiffs may avail themselves of the latter clause of the act of 1917, hereinbefore quoted, the statute is peremptory that it must appear that two-thirds in value of the entire property of the Atlantic Coast Line Railroad Company of Virginia (the foreign corporation) is situated and taxed in the State of North Carolina, and that the said corporation pays franchise tax on its entire issued and outstanding capital stock at the same rate as paid by domestic corporations. Nothing of that sort appears in this record, and we do not understand that it is claimed that it does.

It is said that this stock has not been listed for taxation by its owners under the generally accepted belief that it was not required, and that this interpretation of the law has been heretofore acquiesced in by the State taxing officials. This may be true, as the matter has never been brought to this Court before. While the writer sincerely regrets the misunderstanding and consequent disappointment to owners of the stock growing out of such misunderstanding, yet each judge must interpret the legislative will as he finds it written according to his sincere convictions, and to the majority of this Court the conclusion seems to be irresistable that the plaintiff's stock was issued by a foreign corporation, and, being owned by citizens of North Carolina, it is subject to the tax levied by the General Assembly, inasmuch as it does not come within the exception contained in the statute.

The Southern Railway is a Virginia corporation, chartered by the Legislature of that State. Its stock is issued just as the Atlantic Coast Line stock is issued, by authority of the Legislature of Virginia. The stock of the Southern Railway owned by citizens of North Carolina has always been required to be listed for taxation.

In conclusion, we do not question the validity of the statute hereinbefore quoted, which has been the legislative tax policy of this State for so many years. Acting within its constitutional powers, it is for the Legislature to determine the subjects of taxation, and it is not ours to declare what it shall include and what it shall omit.

Affirmed.

WALKER, J., not sitting.

CLARK, C. J., concurring: I concur fully in the opinion of *Mr. Justice Brown* for the Court in this case, who makes it entirely clear that the Atlantic Coast Line of Virginia as chartered by the State of Virginia is alone authorized to issue the stock, and that the North Carolina incorporation of the same is an ancillary, or subsidiary corporation, without authority to issue stock, and which in fact has issued none. It was incorporated in this State for the purpose of making it a domestic corporation, that our courts might have jurisdiction of its operations here. This was done at a time when it was necessary to procure a recharter of that part of its line which lay between Weldon and the Virginia State line, which this State refused to do except upon the condition that it should become a North Carolina corporation for the purpose of jurisdiction, and of control by the State of its operation in this State. Ch. 544, Laws 1891; *Allen, J.,* in *Cox v. R. R.,* 166 N. C., 656; chs. 100 and 284, Pr. Laws 1893. In the same manner this State has required the domestication here of insurance and other companies before authorizing them to do business in this State, but did not authorize this company nor the other companies thus incorporated here to issue stock. Rev., 1194, 3900-3902, 4747.

In *Cox v. R. R.,* 166 N. C., 654, *Allen, J.,* says that it had been held in the *Staton case:* "From an examination and consideration of the acts of the General Assembly of this State, the defendant was a domestic corporation, at least in so far as it was *necessary to give the courts of this State jurisdiction* over causes of action arising in this State."

I also concur in the ruling that if this were a domestic corporation, even then under the terms of the statute the stock would not be exempt from taxation, though that matter is purely hypothetical and *obiter dictum* in view of the holding that this is stock in a foreign corporation.

However, as this matter has been dwelt upon in the dissenting opinion, it is not improper for me to say that in my opinion, even if this stock

had been issued by a domestic corporation, the Legislature has no power to exempt it from taxation, and therefore the Court should be very slow to assume that the Legislature passed an act that is unconstitutional.

The Constitution of North Carolina, Art. V, sec. 3, provides: *"Taxation shall be by uniform rule and ad valorem.* Laws shall be passed taxing, by uniform rule, *all* moneys, credits, investments in bonds, *stocks,* joint-stock companies, or otherwise; and also, all real and personal property, according to its true value in money."

There is such a thing as "collecting taxes at the source," which originated probably in the National Banking Act, and the Legislature might direct that the taxes upon the stock in any corporation should be deducted from the dividends, if any, declared in favor of each stockholder, and that the companies shall pay the same direct to the State Treasurer and to the sheriff of the county where each stockholder resides, and upon certificate thereof each stockholder should be exempted from further tax thereon; but that is not what is asserted here, which is merely that if the company pays taxes on its capital stock, a very small tax upon the company itself, that the stockholders shall be exempt from payment of all taxes upon their individual property, *i. e.,* the stock which they hold.

John H. Brown is the sole plaintiff in this case, and George C. Jackson, sheriff of New Hanover, and T. D. Meares, clerk and treasurer of Wilmington, are the only defendants. The Atlantic Coast Line Railroad Company has no possible interest in this controversy, and hence is not a party.

The plaintiff not only admits, but alleges in his complaint as the basis of his action, that he is the *owner* of the 50 shares of stock which he asks us to declare exempt from taxation, and that other *owners* of such stock will be benefited by the exemption if we accord it to him.

Shares in a corporation are the individual property of each stockholder, and are not the property of the corporation. The shares of stock are not assets of corporations, but are always charged up in their reports as a "liability." The certificate of shares is a receipt or due bill for the money paid in, or supposed to be paid in, by the holder, and on which he expects to receive dividends in lieu of interest. Consequently, each stockholder is liable for the tax upon his own property, and cannot be exempted from taxation by any statute on the ground that the company pays taxes upon its own property.

In *Comrs. v. Tobacco Co.,* 116 N. C., 446, this Court held, in accordance with the decision rendered by *Chief Justice Smith* in *Belo v. Comrs.,* 82 N. C., 415; 33 Am. Rep., 688, and of *Ashe, J.,* in *Worth v. R. R.,* 89 N. C., 305, and indeed in accordance with all legal authorities and text-books, as follows: "As to corporations, by all the authorities, it is in the power of the Legislature to lay the following taxes, two or

more of them in its discretion at the same time: (1) To tax the franchise (including in this the power to tax also the corporate dividends). (2) The capital stock. (3) The real and personal property of the corporation. This tax is *imperative* and not discretionary under the *ad valorem* feature of the Constitution. (4) The shares of stock *in the hands of the stockholder*. This is also *imperative* and not *discretionary."*

This last, of course, is due by the owner thereof, the stockholder.

It is further said in the same case, on the identical point presented here, as follows: "Originally the tax upon the shares of stock was collected of the individual shareholders at their several places of residence. *Buie v. Comrs.,* 79 N. C., 267. But under that method many shares failed to be listed for taxation. Besides, the shares of nonresident owners, except those of national banks, escaped taxation in this State under the ruling in *R. R. v. Comrs.,* 91 N. C., 454. To remedy this, the provision was passed which is section 14 of chapter 296, Laws 1893 [which has been substantially reënacted at every session of the Legislature since], and which requires the list of shares to be given in by the proper officer of the corporation, which shall pay the same in behalf of the shareholders. This does not affect the liability of the shares to tax as the property of the shareholders, but is simply for the convenience of the State in collecting the tax. The effect is merely to change the *situs* of the shares for taxation from the residence of the owner to the locality where the chief office of the corporation is situated, as was held in *Wiley v. Comrs.,* 111 N. C., 397. It simply extends to the collection of taxes due by shareholders in other corporations the mode of collection already in force as to shareholders in national banks. . . .

"The capital stock belongs to the corporation. The shares or certificates of stock are entirely a different matter. They belong to the shareholders individually, and under the Constitution must be taxed *ad valorem* like other 'property belonging to the holder, independently of the taxation upon the corporation, its franchises, etc.'"

This case has been cited with approval. *Comrs. v. S. S. Co.,* 128 N. C., 559; *Lacy v. Packing Co.,* 134 N. C., 571; *S. v. Wheeler,* 141 N. C., 775; *Land Co. v. Smith,* 151 N. C., 72; *Pullen v. Corporation Commission,* 152 N. C., 554; 58 L. R. A., 590, 594, 601, note; 60 L. R. A., 367, note.

To the same effect are the decisions throughout the country, which can be found grouped in the elaborate notes to *State Board v. Coggin* (Ill.), 58 L. R. A., 513-618, which cite the above case at pages 590, 594, 601. On page 594 it quotes from *Chief Justice Waite,* in *Tenn. v. Whitworth,* 117 U. S., 129, as follows: "In corporations four elements of taxable value . . . are sometimes found: (1) franchises; (2) capital stock in the hands of the corporation; (3) corporate property; and (4)

24—179

shares of the capital stock *in the hands of the individual stockholders."*

In *Pullen v. Corporation Commission,* 152 N. C., 553, *Manning, J.,* for the Court says: "It is likewise well settled by the language of our State Constitution, by many decisions of this Court, and of the Supreme Court of the United States, and now generally accepted law, that the property of a shareholder of a corporation in its shares of stock is a separate and distinct species of property from the property, whether real, personal, or mixed, held and owned by the corporation itself as a legal entity. It would be useless to cite authority to support a proposition so well established and generally accepted."

*Brown, J.,* in the same case, concurring, says, at page 562 (68 S. E., 162): "I agree, also, that it is well settled that the shares of stock in any corporation, when owned by individuals, are separate and distinct property from the assets of the corporation and may be taxed as such."

In the same case *Hoke, J.,* at p. 582 of 152 N. C., says, quoting from *Bank v. Tenn.,* 161 U. S., 146: "The capital stock of a corporation and the shares into which such stock may be divided and held by individual shareholders are two distinct pieces of property. The capital stock and the shares of stock in the hands of the shareholders may both be taxed, and it is not double taxation. *Van Allen v. Assessors,* 3 Wall., 573; *People v. Commissioners,* 4 Wall., 244, cited in *Farrington v. Tennessee,* 95 U. S., 687.

"This statement has been reiterated many times in various decisions by this Court, and *is not now disputed by any one."*

The stock held by each shareholder in a corporation is the individual property of the shareholder to be sold, devised, or disposed of at his will alone. It is in no sense the property of the corporation, or in any wise subject to its control, and the General Assembly under the Constitution must tax it as the property of the owner by uniform rule. It cannot be exempted from taxation in the hands of the owner because the corporation is required to pay tax upon its own property or privileges.

This action seeks to secure by judicial construction the exemption from taxation of, it is estimated, $4,000,000 of Atlantic Coast Line stock owned by residents of this State, and thus make it a "nontaxable 7 per cent stock." This would throw upon those not able to own such stock —upon the laborers, farmers, and others who create the wealth of the State, in addition to their own taxes already sufficiently high—the payment of this tax, which should be paid (under the Constitution and in justice) by those who are able to invest their surplus in the stocks of this corporation.

By Ordinance 34, Convention of 1866, those in control of the Wilmington & Weldon Railroad Company (the predecessor to this corporation) which had been largely built by the issuance of State bonds, procured the privilege under which every holder of $1,000 of any valid

State bonds (which a few years later were refunded by the State at 40 cents, *i. e.*, $400 in new 4 per cent bonds) could present it to the State Treasurer and would receive in exchange ten shares of the State's $1,500,000 stock in the then Wilmington & Weldon Railroad. This stock by the process of watering its shares and distributing bonds as bonuses to its stockholders is now worth $40 or more for every $1 so invested. See *Allen, J., Cox v. R. R.,* 166 N. C., at page 655. This should be sufficient without now exempting this stock from all burdens of the State, county, and city governments, on the alleged ground that the corporation pays taxes upon its own property, for which it is liable like all property holders.

There was a time when this corporation, and also the Seaboard Air Line Railway (and the predecessors of both), claimed and obtained for many years an exemption from taxation on their property. This exemption from all taxation by the corporation itself continued down till 1892, when, in *R. R. v. Alsbrook,* 110 N. C., 137, it was declared that such exemption was contrary to the State Constitution, which required a uniform taxation on all property and the exemption was held invalid. On a writ of error to the United States Supreme Court, this decision was, in every respect, affirmed (*R. R. v. Alsbrook,* 146 U. S., 279), and it has often since been cited as authority. See citations in Anno. ed.

It would be sardonic to restore this exemption from taxation which was taken from the company itself by transferring the exemption to the stock in the hands of the stockholders. Indeed, if the stock of one corporation can be exempted from taxation because the corporation pays tax on its own property, then the stock of every corporation in the State can be thus exempted, and there will be a gross partiality in exempting "stocks" which are named in the Constitution as liable for taxation *ad valorem,* while all others must pay taxes on their property of every description. There is no reason why those rich enough to invest in stocks shall be exempted from taxation, which will thus be thrown upon those who have no surplus to invest in that manner. If stockholders can be exempted from taxation on their stocks because the corporation pays tax on its own property, with equal reason the mortgage bonds issued by such corporations should be exempt because the corporation pays taxes on the property covered by the mortgage.

Of all times, when high taxation causes complaint, there should be equality, and no special privileges by reason of the exemption of the property of those who are best able to bear it.

The Constitution of this State, Art. V, sec. 3, specifies the only property which may be exempted from taxation, and in it there is no authority to the Legislature to exempt the *owners* of the "stocks" and "bonds" of any corporation from payment of taxes upon the true value thereof because the corporation has paid taxes (as it rightly should do)

upon its own property nor for any other reason. In that same article, sec. 5, there is authority to exempt "wearing apparel, arms for muster, household and kitchen furniture, the mechanical and agricultural implements of mechanics and farmers, libraries and scientific instruments, or any other personal property, to a value *not exceeding* $300." But the State has felt so poor that every farmer and mechanic for more than 50 years has been required to pay taxes on his clothing for his family, his household and kitchen furniture, his blacksmith's and farming tools and plows "above $25," until, the matter being called to the attention of the Legislature (see concurring opinion in this Court, *Wagstaff v. Highway Commission,* 177 N. C., at bottom of page 360), this exemption was raised to $300 for the first time by the Legislature of 1919.

Those who labor and toil have been required to pay taxes on everything above $25—on their pots and pans, the washing tub of the washerwoman, the farmer on his plows, the blacksmith on his tools, and every one on everything above $25. This has been the policy of this State as declared by the Legislature. We are now asked to say that the Legislature, contrary to the equality of taxation required alike by the Constitution and by justice, had power to exempt, and has exempted, the owners of many millions of dollars of the best property in the State, the stock of its most prosperous corporation, from paying any share of the burden of maintaining the Government under which they live, and thus make it nontaxable, though this Court and the United States Supreme Court have held that the property of the corporation itself could not be exempted from taxation by the act of the Legislature.

It is a maxim of the law, as well as of political economy, that the "power to tax is the power to destroy," and there is no power more deadly to the prosperity of a people than to increase taxation on those of small means, and who by their labor and their efforts earn a bare living, by exempting the wealthy, and powerful aggregations of wealth, whose just share of taxation must thus be paid by the class that is less wealthy and influential.

The Constitution provides that the taxation laid upon the poll "shall *never* exceed $2" for State and county purposes, and that this shall be applied solely to "education and the support of the poor." And this Court so held in 3 cases in 148 N. C., *i. e., R. R. v. Comrs.,* 148 N. C., 220, 245, *Judge Connor* saying: "This question cannot arise again"; *R. R. v. Comrs.,* 148 N. C., 248, and *Hoke, J.,* in *Perry v. Comrs.,* 148 N. C., 521. This limit has been constantly exceeded since, and poll taxes as high as $7 and $8 per capita have not been infrequent, and the proceeds have been often used, not solely "for education and the support of the poor," but to relieve the property of the wealthy from taxation.

A poll tax was levied once in England when it caused Wat Tyler's Rebellion, and was repealed. For long centuries it has been unknown there. It survives in this country in very few States (named by *Connor, J.,* in *R. R. v. Comrs.,* 148 N. C., 244; see, also, *ibid.,* 253), and in them it is appropriated to "education and the poor." The poll tax is essentially unjust because exacted regardless of ability to pay, and is condemned by all writers on political economy. It is further unjust here because those unable to pay it are disfranchised, which penalty is not inflicted upon those failing to pay taxes on their property, though this last discrimination is to be removed by a constitutional amendment which is to be voted on this year. But if the State has been so pressed that it has been unable to dispense with a tax on the poll so universally condemned as unjustly discriminatory, certainly it is a violation of the spirit as well as the letter of the Constitution if the Legislature has attempted to exempt the *owners* of stock in all corporations, or in this corporation, from payment of their just dues thereon for the maintenance of the Government.

The constant attempt to procure from Congress and State Legislatures an exemption of the property of corporations and of the wealthy, or to procure from courts a construction of statutes to that effect is a great and just cause of public dissatisfaction.

After a hundred years ruling that Congress could levy an income tax, the United States Supreme Court, after reaffirming that ruling, by a change of the vote of one judge reversed it, which caused the adoption of the Sixteenth Amendment over the power of aggregated wealth, and, without the income tax and the excess profits tax thus authorized, it would have been impossible for this country to have carried to a successful conclusion the great "World War." But in the interval between the action of the changeable judge, and the enactment of the Sixteenth Amendment, many billions of taxes were taken off of the great corporations and the wealthy upon whom Congress had placed an income tax, and the burden was transferred to the backs of the toiling millions who were already overtaxed.

The time was when—

> "Rome veiled earth with its haughty shadow,
> And filled it, till the o'er canopied horizon failed,
> With the rushing of her wings."

By the power of taxation which exempted or favored the wealthy and transferred the burden to the masses, its fairest and most fertile provinces became a desert. As Pliny said: *"Latifundia perdidere Italiam"* —that is, "The accumulation of wealth by the few destroyed Italy."

In France, the same discrimination exempting property in the hands of the wealthy from just taxation and passing the burden on to those who created the wealth of the country resulted in the French Revolution, which took from the hands of the nobility and the church their accumulated property in its entirety and placed it in the hands of the people. The same cause has brought about the confiscation of the vast wealth of the Czar and the nobility in Russia and has divided it among the people. In this country we have built our Constitution upon the foundation of "equal rights to all and special privileges to none." And as long as that is observed by lawmaking bodies and the courts our troubles will be but light.

When a proposition is presented to this Court that the Legislature has enacted, or can enact, that the owners of surplus wealth which happens to be invested in the stocks and bonds of corporations are exempt from taxation whenever the corporation has paid taxes on its own property, it is within my duty as a member of this bench to plainly state that the Constitution of this country and the safety of its institutions will not permit, and that the Legislature has not in fact enacted so dangerous a measure against which all history is a warning.

The State Tax Commission held that the plaintiff was not entitled to have his stock exempted from taxation, and in the Superior Court Judge Stacy dissolved the restraining order and filed an opinion giving his reasons. There was no appeal from this order and judgment, but the plaintiff undertook to have Judge Stacy reconsider and reopen the matter for argument and rehear it upon the same state of facts. This was a most irregular proceeding, and was condemned in *Bonner v. Rodman,* 163 N. C., 1. At this rehearing, however, Judge Stacy again affirmed his ruling that the plaintiff was not entitled to have his stock exempted from taxation and filed a very conclusive opinion.

In *Blake v. Askew,* 76 N. C., 326, *Reade, J.,* said: "This is manifestly a feigned issue" and "not fit to be entertained." It cannot be said that this is manifestly "a stock speculation action," but it may be shrewdly suspected to be intended to procure a ruling by the Court that, though the plaintiff's stock has not been exempted from taxation by the Legislature, the Legislature has power to do so hereafter. If this were so held, it might boost the stock as being potentially "nontaxable" with great profit to those who may have arranged the proceeding. The holding of the State Tax Commission and the twice repeated opinion of Judge Stacy should be affirmed.

ALLEN, J., dissenting: I rest my dissent upon the following statement in the opinion of the Court: "We agree with the learned counsel that the Atlantic Coast Line Railroad Company of Virginia is a corporation

of the State of North Carolina, and that it was so decided in *Staton v. R. R.*, 144 N. C., 145, and affirmed in *R. R. v. Spencer*, 166 N. C., 522."

I agree that this is a correct statement of fact and law, and it is supported by *Cox v. R. R.*, 166 N. C., 652, in addition to the authorities cited.

The Court then holds that the stockholder must list his shares of stock for taxation because the corporation has not paid "a tax on its capital stock," and this position of the Court will of course be met if I can show that it is not necessary for the corporation to actually pay "a tax on its capital stock" in order that the stockholder may be exempt, or, if necessary, that the corporation has paid the tax.

Is it necessary for the corporation to pay in order that the stockholder may be relieved?

I think clearly not, because the corporation is required by law to list its capital stock and pay the taxes thereon, and if it does not do so, it is the duty of the taxing powers to make it pay, instead of trying to shift its burdens to the shoulders of the stockholders.

Does this corporation pay a tax on its capital stock?

It is alleged in the complaint and admitted in the answer that the Atlantic Coast Line Railroad Company of Virginia paid in this State in 1917 a license tax of $10 per mile for nine hundred miles; that the *ad valorem* value of the tangible assets of the company for 1917, as fixed by the State Tax Commission, was $15,891,335, and that of the franchise for that year as fixed by said commission was $18,754,010.

Note that the value of the franchise of said corporation as assessed by the State Tax Commission for taxation for the year 1917, which is the year for which the taxes in controversy in this action were assessed against the plaintiff, is admitted to be $18,754,010.

Does this valuation of the franchise include capital stock?

This is answered by the agreement of the parties filed in the record as follows:

"In this case it is agreed as follows:

"1. That under the Revenue Law and Machinery Act of 1917, in taxing railroad companies, the State Tax Commission, in making up the tax to be assessed against railroad companies, whether domestic or foreign, did not tax the capital stock of any railroad company except as such capital stock was embraced within the items mentioned in section 64 of the Machinery Act; that in assessing tax against railroad companies organized under the laws of this State, where such railroad companies were operated wholly within this State, the entire capital stock of the railroad company was embraced in and assessed as a part of the 'value of the franchise' as provided by section 64 (b) of the Machinery Act; that in assessing tax against domestic railroad companies, a part

of whose road is in this State and part in another State, the commission did not assess its capital stock other than as provided in section 64 (b), and only a part of its capital stock, as well as of its other property, was apportioned under section 65 of the Machinery Act of this State—'in proportion to the length the main line of such road in this State bore to the whole length of said main line'; and in assessing tax against a foreign railroad, part of whose road was in this State and part thereof in another State, the assessment against the capital stock of such road, as well as its other property, was made in identically the same way as the assessment was made against a domestic railroad company, a part of whose road was in this State and part in another State."

Three facts are settled by this agreement:

1. That in assessing tax against railroad companies organized under the laws of this State where such railroad companies were operated wholly within this State, the entire capital stock of the railroad company was embraced in and assessed as a part of the value of the franchise.

2. That in assessing tax against domestic railroad companies a part of whose road is in this State and a part in another State, a proportionate part of the capital stock was valued as a part of the franchise, the part so valued being in proportion to the length the main line of such road in this State bore the whole length of said main line.

3. That in assessing taxes against a foreign railroad a part of whose road was in this State and a part in another State, the assessment against the capital stock of such road was made in identically the same way as the assessment made against the domestic railroad company, a part of whose road was in this State and a part in another State.

It therefore appears as an admitted fact in this record that in the value of the franchise of the Atlantic Coast Line Railroad Company of Virginia, the State Tax Commission included the proportionate part of its capital stock in accordance with the terms of the legislative act, and that it has paid as other domestic corporations similarly situated.

Why then should not its stock have the same exemption granted to the stockholders of other corporations?

Particularly so when the Court says in its opinion that the Atlantic Coast Line Railroad Company of Virginia is a corporation of North Carolina, and the State Tax Commission says in its answer "that it has been the policy of the State of North Carolina for more than thirty years not to require to be listed the shares of stock held by residents of the State in corporations created by and chartered under the laws of the State."

It is not contended, and cannot be, that the language, "pay a tax on its capital stock," means on its entire capital stock, because in the same statute provision is made for the valuation of the capital stock of domes-

tic corporations, and that in assessing this value the value of the tangible property is deducted from the value of the capital stock so that no domestic corporation pays on its entire capital stock.

Again, in the same section quoted in the opinion of the Court, it is provided that foreign corporations must pay on its entire capital stock in order that the stockholder may be exempt, making the clear distinction that as to the domestic corporation the stockholder shall not pay a tax on his stock if the corporation pays a tax on its capital stock, but that the foreign corporation must pay on its entire capital stock in order for this exemption to prevail.

Whether this is an unlawful discrimination between foreign and domestic corporations is not now before us, and I do not express any opinion on it.

I submit that this demonstrates that the Atlantic Coast Line Railroad Company of Virginia is paying a tax on its capital stock just as other domestic corporations do, and if so, the shares of stock of the plaintiff are not liable to taxation.

It is insisted, however, notwithstanding the statement in the opinion, that there are two corporations, one domestic and the other foreign, and that the Atlantic Coast Line Railroad Company of Virginia, in which the plaintiff holds stock, and which is referred to as the parent corporation, and the North Carolina corporation as auxiliary, is the foreign corporation.

This renews the contest that has existed in this State since 1893, and which was regarded as settled by *Staton v. R. R., Spencer v. R. R.,* and *Cox v. R. R.,* the Court holding in each of these cases, in accordance with the contention of the State, that the corporation was domestic, unless we are willing to say that the same corporation is domestic when it is asking to exercise its privilege of removing its causes to the Federal Court for trial, and foreign when the State is endeavoring to collect taxes.

The history of legislation on this question goes back of 1899, and, if the present question is understood, it must be considered.

The parent corporation of the Atlantic Coast Line system was the Wilmington and Weldon Railroad, chartered by the General Assembly of North Carolina in 1834.

In 1893 the right of this corporation to exemption from taxation was challenged, and finally a settlement was reached, embodied in ch. 100, Private Laws 1893. At the same session the corporation was authorized to consolidate with other railroad companies, but, no action being taken under this statute, in 1899 the authority to consolidate was continued by ch. 105, Private Laws 1899, which contains this provision: "That any and all corporations consolidated, leased, or organized under the

provisions of this act shall be domestic corporations of North Carolina, and shall be subject to the jurisdiction thereof."

These several acts were referred to and discussed in *Cox v. R. R., supra,* and the Court adds: "It was under the authority of these several acts of the General Assembly that the Wilmington and Weldon Railroad became a part of the Atlantic Coast Line. It had its existence originally by reason of the legislative act of this State, and was therefore a creation of the State. It continued a domestic corporation of this State for more than sixty years, and prospered under our laws. It finally came to the State and said that it desired to enter into other business arrangements, and the State consented, but upon condition that the Wilmington and Weldon Railroad Company or the company taking over its property or with which it should be consolidated should continue to be liable in the courts of the State for wrongs done in the State, which condition was accepted and acted on by the company."

If the condition as to removal of causes prevails by consolidating under the act, why should not the same effect be given to the provision that "any and all corporations consolidated, leased, or organized under the provisions of this act shall be domestic corporations of North Carolina, and shall be subject to the jurisdiction thereof."

Again, in the *Staton case,* the Court says: "The statutes and public records show that the Wilmington and Weldon Railroad Company, a domestic corporation, has, by permission of the Legislature, become one of 'the constituent roads' in a line of consolidated railways extending through six States. In the consolidation are a large number of other 'constituent roads.' To say that each of these roads, chartered in six different States from Virginia to Alabama, have, by the consolidation, become citizens of the State of Virginia is rather startling. If this result, so far as the Wilmington and Weldon Railroad Company is concerned, has been accomplished by virtue of the power conferred by the Act of 1899, ch. 105, in defiance of the express provision in the statute that it should continue a domestic corporation, it would indicate an absence of power in the Legislature to guard the sovereign rights of the State in respect to corporations of its own creation. It would seem perfectly clear that a railroad corporation has no power to change its domicile. While the Legislature may permit a Virginia corporation to come into this State and consolidate with one of her own corporations, we cannot perceive how, in availing itself of such permission, the Virginia corporation may take the North Carolina corporation out of this State into Virginia, and so adopt it that the State, by virtue of whose laws it came into existence and continues to exist, loses jurisdiction of it for the purpose of bringing it into her courts to answer for wrongs done her own citizens. While we do not concede that such would be the

result of permission to consolidate, in the absence of restrictive words, certainly where, in the statute conferring the power to consolidate, it is expressly provided that the corporation, together with any corporations with which it should consolidate, should remain a domestic corporation, it would seem that such restriction would place the question beyond controversy."

I think it therefore appears that ch. 77, Laws 1899, is not the only statute relating to the matter; that the consolidation of the Atlantic Coast Line was under ch. 105, Private Laws 1899, and that the Wilmington and Weldon Railroad, a corporation chartered by North Carolina, with its offices and property in this State, was not permitted to enter into this consolidation except upon condition that the corporations associated with it should be North Carolina corporations.

The Virginia corporation became a part of the system upon this condition, and we have heretofore held it is bound by it, and in recognition of its obligation, it came to the State and asked that it be formally accepted as a North Carolina, which was done by ch. 77, Laws of 1899.

And in this last statute, which has been accepted, the corporation, whether foreign or not, has been domesticated for the purposes of taxation as it provides:

"Sec. 4. The powers given by this act to the Atlantic Coast Line Railroad Company of Virginia are granted upon the express condition that the property of the said Atlantic Coast Line Railroad Company of Virginia in this State shall always be liable to taxation under the Constitution and laws of this State, and that said company shall be subject to the tariffs, rules, and regulations prescribed by the board of railroad commissioners."

Acting under this statute and under the revenue laws of the State, the corporation is now paying a privilege tax of $9,000, and taxes on tangible property of the value of $15,891,335, and on its franchise, which includes capital stock according to the method of valuation adopted by the State, of $18,754,010, which is all the corporation would have to pay on present valuations, if conceded to be a domestic corporation.

If, therefore, the Atlantic Coast Line Company of Virginia is now paying a tax on its capital stock and other property, and if the State is collecting taxes from it as a domestic corporation, why should not its stockholders enjoy the same exemption accorded to the stockholders of other domestic corporations?

I concur fully in the proposition that it is for the Legislature to determine the subjects of taxation, and think under the facts in this record it has said the shares of the plaintiff shall not be taxed.

I attach no importance to the failure to provide in these acts for a capital stock or the issuing of stock, because this is not usual in acts of

consolidation, and if the corporations become North Carolina corporations by entering into the consolidation, they brought with them their capital stock.

I think it wise to adhere to our former decisions, and when we fail to do so we assume the attitude of holding that the same corporation is domestic when it is invoking the right of removal to the Federal Court, and foreign when the State wishes to impose a tax.

We also run the risk of losing the tax on the franchise of the corporation, valued at $18,754,010 (I do not say we will lose it), upon the ground that, being a foreign corporation engaged in interstate commerce, we can do no more than tax its property in this State, considered in connection with the use, and if such a result should be attained, the corporation can well afford to reimburse the stockholders on stock of the par value of $4,000,000. See *Gloucester Ferry case,* 114 U. S., 196; *P. & S., S. S. Co. v. Phila.,* 122 U. S., 344; *Postal Tel. Co. v. Adams,* 155 U. S., 688.